53 F.3d 331
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Joyce LYNDE, Plaintiff-Appellant,
v.
BLUE CROSS AND BLUE SHIELD MUTUAL OF OHIO, Defendant-Appellee.
 No. 93-4267.
 United States Court of Appeals, Sixth Circuit.
 April 25, 1995.
 
 Before: NORRIS and DAUGHTREY, Circuit Judges; and FEIKENS, Senior District Judge.*
 PER CURIAM.
 
 
 1
 This is an action for the recovery of medical expenses under an employee health insurance plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. Sec. 1101 et seq. Plaintiff-Appellant, Joyce Lynde, argues that the district court erred when it granted defendant-appellee, Blue Cross Blue Shield of Ohio's ("Blue Cross") motion for summary judgment. Appellant argues there are material issues of genuine fact whether Blue Cross: (1) was contractually bound to provide coverage; (2) was estopped from denying coverage and/or waived its right to deny coverage; and (3) acted in bad faith in denying coverage for appellant's medical expenses. For the reasons discussed below, the judgment of the district court is AFFIRMED.
 
 I. FACTS
 
 2
 On August 22, 1991, appellant filed a complaint against Blue Cross in the United States District Court for the Northern District of Ohio alleging violations of ERISA and state law claims of breach of contract, estoppel, waiver and bad faith. Specifically, appellant alleged that Blue Cross was contractually bound to provide coverage for her medical expenses, that she had relied on such coverage and that Blue Cross was estopped and/or had waived any right to deny or cancel coverage under the subject policy. Appellant also alleged that Blue Cross acted in bad faith when it cancelled coverage retroactively.
 
 
 3
 Appellant was employed by Star Diesel Truck Center ("Star Diesel") which was owned and operated by Steven Kerr. Kerr also owned Americargo, Inc.[1] Appellant was afforded medical insurance coverage under a group contract of insurance (the "group contract" or the "contract") between Blue Cross and Americargo, (the "Americargo Group Contract").
 
 
 4
 Under the group contract, Blue Cross set up three[2] group contract numbers to classify Americargo group members and distributed three separate sign-up sheets. The group numbers indicated the different physical locations of the Americargo group.[3] Appellant was classified at the physical location of Star Diesel, Group No. JNG03, and signed the corresponding sign-up sheet for that location and group number.
 
 
 5
 The benefits of the group contract were expressly conditioned on consideration, including the receipt of premium payments as described in the "Schedule of Benefits and Payments." The "Schedule of Benefits and Payments" provided in pertinent part:
 
 
 6
 Payments are due on the first of the month; this is called the Premium Due Date.
 
 
 7
 * * *
 
 
 8
 * * *
 
 
 9
 This contract has a grace period of 31 days.[4]
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 If the Group does not make payment during the grace period, the Contract will be cancelled, at the Plan's option, on the last day of the period for which premiums were paid.
 
 
 13
 With respect to its termination, the group contract provided:
 
 Contract Termination
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 The Plan may terminate this contract at any time without notice in the event the Group does not make the premium payment within the grace period specified in the Schedule of Benefits and Payments.
 
 
 17
 Blue Cross provided medical insurance pursuant to the group contract from October 1, 1988, through July 31, 1989, exactly ten months.
 
 
 18
 Initially only one total premium was submitted covering all three Americargo companies. After January 1989, the two remaining locations of the Americargo group submitted separate payments for their respective portion of the premium. However, the group premium was never deemed paid until Blue Cross received the total premium amount from both locations.
 
 
 19
 Blue Cross received a check for Star Diesel's pro rata share of the August premium on September 13, 1989, within the 45-day grace period.[5] Subsequent to the receipt of Star Diesel's payment, Blue Cross notified Americargo that its payment was seriously past due and that the contract would be terminated if Blue Cross did not receive its check by 9:00 a.m. the next morning. Americargo failed to remit payment the following day or at any time within the 45-day grace period.[6] On September 29, 1989, pursuant to the termination provision of the group contract, supra, Blue Cross cancelled the Americargo Group Contract effective August 1, 1989.
 
 
 20
 Appellant underwent kidney transplant surgery on September 17, 1989, at University Presbyterian Hospital in Pittsburgh. On September 17 or 19, 1989,[7] during a telephone call by a Presbyterian Hospital employee to Blue Cross, a Blue Cross employee stated that appellant's coverage "was still active." However, subsequent to the phone call and consistent with its policy of termination, Blue Cross refused to pay any of appellant's medical expenses connected with the transplant which occurred subsequent to August 1, 1989, the effective date of the Americargo Group Contract termination.
 
 II. ANALYSIS
 
 21
 A district court's grant of summary judgment is reviewed de novo. Rector v. General Motors Corp., 963 F.2d 144, 146 (6th Cir.1992). Summary judgment is appropriate under Fed.R.Civ.P. 56 where no genuine issue of material fact remains to be decided and the moving party is entitled to judgment as a matter of law. Atlas Concrete Pipe, Inc. v. Roger J. Au & Son, Inc., 668 F.2d 905, 908 (6th Cir.1982); Blakeman v. Mead Containers, 779 F.2d 1146, 1150 (6th Cir.1985). Blue Cross, as the moving party, bears the initial burden of establishing the nonexistence of any genuine issue of fact that is legally material to a judgment in its favor by informing the court of the basis for its motion and identifying the pleadings, affidavits and depositions which it believes demonstrate the absence of a genuine issue of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, the mere existence of a scintilla of evidence in support of appellant's position is insufficient; there must be evidence on which the jury could reasonably find for appellant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). If Blue Cross demonstrates that, after a reasonable period of discovery, appellant is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of her case, summary judgment should be granted. Celotex, 477 U.S. at 322.
 
 
 22
 Under ERISA, a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C.A. Sec. 1132(a)(1)(B) (emphasis added). In this case, appellant seeks to recover plan benefits on the basis of breach of contract, estoppel and/or waiver, and bad faith. Each of these state common law claims relate to the subject ERISA plan and are thus preempted by ERISA. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987); International Resources, Inc. v. New York Life Ins. Co., 950 F.2d 294 (6th Cir.1991); Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272 (6th Cir.1991).
 
 
 23
 Appellant sets forth three theories in support of her claims for recovery of benefits under the Americargo Group Contract. First appellant alleges that there were two separate group contracts and that Blue Cross breached its contract with Star Diesel when it terminated the Star Diesel contract on the basis of Americargo's delinquency. Second, appellant alleges Blue Cross is estopped from denying coverage because appellant reasonably relied on its statement that her coverage was "still active" in electing to have transplant surgery. Alternatively, appellant argues that Blue Cross waived its right to cancel the contract on the basis of Americargo's "tardiness" because it had accepted such late payments in the past. Finally, appellant argues that Blue Cross intentionally cancelled the Americargo Group Contract to avoid paying the expenses associated with her transplant surgery and thus acted in bad faith.
 
 A. Separate Contracts Theory
 
 24
 Appellant's action for recovery of benefits rests primarily on the theory that the separate group contract numbers and separate sign-up sheets utilized by Blue Cross denote separate insurance contracts. Thus, Blue Cross breached its contract to Star Diesel employees when it cancelled Star Diesel's insurance coverage because of Americargo's delinquent payment. Appellant cites Ohio case law in support of her argument. In McMahan v. New England Mut. Life Ins. Co., 888 F.2d 426, 429-30 (6th Cir.1989), this court held that state case law relating to construction of an ambiguous contract is preempted by ERISA. State case law can, however, be referred to for guidance by this court in construing and interpreting the federal common law. In any event, the contract analysis is premature because there is no evidence in the record of a separate contract as argued by appellant.
 
 
 25
 There is only one contract in the record, "The Americargo Group Contract for Health Care Coverage." Appellant has not offered any evidence of the existence of a second contract for the Star Diesel division of the Americargo group.[8] The fact that there was a separate sign-up sheet for each Americargo company, alone, does not support appellant's theory that there was a separate plan or contract. Appellant's allegation that there was a separate contract based on two separate group numbers and varying coverage is also not supported by any evidence in the record. Prior to January 1989, only one payment was submitted as payment of the group premium. Although each location subsequently remitted its pro rata portion of the total premium, there was only one contract in existence under which Americargo and Star Diesel employees were covered.
 
 
 26
 Appellant is simply trying to manufacture an ambiguity where none exists. There is nothing ambiguous about assigning different group numbers to the different companies covered under the same group plan. There is also nothing ambiguous about having each location remit its pro rata portion of the group premium separately.[9] Because there were no ambiguities in the Americargo Group Contract as written, the group contract was rightfully terminated effective August 1, 1989, pursuant to the termination provisions of the Americargo Group Contract because of Americargo's failure to remit its pro rata portion of the August premium within the 45-day grace period. Because Star Diesel's coverage was provided through the Americargo Group Contract, its coverage was also terminated effective August 1, 1989.
 
 B. Estoppel/Waiver
 
 27
 Appellant argues that Blue Cross is estopped from denying coverage because appellant reasonably relied on coverage to her detriment based upon Blue Cross's conduct. Appellant alleges that Blue Cross did not notify appellant or Star Diesel of the cancellation of the policy prior to appellant's decision to undergo costly kidney transplant surgery and that her decision to have the surgery was made in reliance on the belief that she had health coverage due to Blue Cross's statement to Presbyterian Hospital that her coverage was "still active." Appellant argues this statement was significant because it was made after the expiration of the 45-day grace period.
 
 
 28
 Alternatively appellant argues that Blue Cross waived its right to deny coverage due to Blue Cross's previous acceptance of late payments. Appellant asserts that she reasonably relied to her detriment upon the belief that if the subject payment and/or payments were made in a manner consistent with Americargo and Star Diesel's payment history relevant to the subject premiums, she would continue to receive health benefits under the subject insurance policy.
 
 
 29
 An estoppel claim based on state common law is preempted by ERISA. See, e.g., Cromwell, 944 F.2d at 1275. An estoppel claim, such as is raised here, cannot be considered where it is not supported by extrinsic evidence showing a clear intent to modify the ERISA plan. Oral statements as in Gordon v. Barnes Pumps, Inc., 999 F.2d 133 (6th Cir.1993), and Musto v. American General Corp., 861 F.2d 897 (6th Cir.1988), are not sufficient. The oral statement to Presbyterian Hospital that appellant's coverage was "still active" is likewise insufficient; it cannot work an estoppel to prevent cancellation of the group contract for nonpayment of premium specifically provided for in the contract's express terms.
 
 
 30
 Additionally, appellant's claims of estoppel and waiver are meritless. There is no evidence that appellant "relied to her detriment" on the statement that her coverage was "still active," allegedly made to Presbyterian Hospital. Armistead v. Vernitron, 944 F.2d 1287, 1298 (6th Cir.1991). Furthermore, appellant could not have relied on the statement, which was made on September 17 or 19, 1989, in deciding to undergo surgery because her decision was obviously made prior to September 17, 1989, the date she was admitted to the hospital. Appellant did not seek treatment or change her position in reliance on the representation; her transplant was not an elective procedure, it was necessary. See, e.g., U.S. Use of Youngstown Welding and Eng'g Co. v. Travelers Indem. Co., 802 F.2d 1164, 1168 (9th Cir.1986); Carlton v. Interfaith Medical Center, 612 F.Supp. 118, 125 (D.C.N.Y.1985); Fine v. Semet, 514 F.Supp. 34, 45 (S.D.Fla.1985). Appellant's own evidence shows that her decision to undergo treatment was made before any alleged representation by Blue Cross.
 
 
 31
 There is also no basis for appellant's waiver theory. Blue Cross's cancellation of medical coverage for appellant was in accordance with the express terms of the contract despite appellant's claim that Blue Cross waived its right to cancel due to its previous acceptance of late payments from Americargo. Even if Blue Cross had sometimes accepted late payments from Americargo, this conduct cannot be used to alter the express terms of the contract. Gordon, supra. The contract specifically provides:
 
 
 32
 No change in this Contract will be effective until approved by an authorized officer of the Plan. This approval must be noted on or attached to this Contract. No agent or representative of this Plan other than an officer, may change the Contract or waive any of its provisions.
 
 
 33
 Appellant offered no evidence of an "approved" change allowing more than the 45-day grace period given to Americargo. Blue Cross's conduct in terminating the Americargo Group Contract was consistent with both its express terms as stated above and applicable case law. Americargo was notified that unless full payment was received by a date and time certain, the group contract would be cancelled. Moreover, the group contract clearly provides that coverage stops on the last day of the period for which premiums were paid. It is undisputed that Americargo did not comply; no timely and complete payment was ever made for the period beginning August 1, 1989, within the 45-day grace period. Thus Blue Cross rightfully terminated the Americargo Group Contract effective August 1, 1989.
 
 C. Bad Faith Claim
 
 34
 Finally, appellant alleges that Blue Cross acted in bad faith because Blue Cross allegedly knew that appellant was undergoing costly kidney transplant surgery before it decided to cancel the policy and Blue Cross's decision to terminate was allegedly based upon the expensive transplant surgery, not Americargo's tardy payment.
 
 
 35
 Appellant's bad faith claim is clearly preempted by ERISA. Pilot Life, 481 U.S. at 48-51. In Pilot Life, the Supreme Court held that ERISA preempts state common law tort and contract actions which relate to an employee benefit plan, including bad faith claims "asserting improper processing of a claim for benefits under an ERISA-regulated plan." Id. at 57. See also, Fugarino v. Hartford Life and Accident Ins. Co., 969 F.2d 178, 186 (6th Cir.1992) (claims of bad faith asserted by the employees of a restaurant who were participants and beneficiaries of an ERISA plan "are the subject of ERISA preemption"); International Resources, 950 F.2d at 299 (plaintiffs' claims for bad faith were preempted by ERISA and were not saved by ERISA's "savings clause", 29 U.S.C. Sec. 1144(b)(2)(A)). In reaching the conclusion in International Resources, this court found that:
 
 
 36
 Even though the Mississippi Supreme Court has "identified its law of bad faith with the insurance industry, the roots of this law are firmly planted in the general principles of Mississippi tort and contract law."
 
 
 37
 Id. at 300 (quoting Pilot Life, 481 U.S. at 50). Ohio's cause of action for bad faith is similarly rooted in Ohio's tort and contract law. See e.g., Slater v. Motorists Mut. Ins. Co., 187 N.E.2d 45 (Ohio 1962); Roberts v. Personal Serv. Ins. Co., 467 N.E.2d 257 (Ohio 1983). Thus, appellant's bad faith claim is preempted by ERISA.
 
 
 38
 Additionally, there is no evidence which supports appellant's claim. Simply asserting that Blue Cross knew appellant was going to have transplant surgery when it decided to cancel the policy is not indicative of any bad faith in light of the facts and circumstances as they existed at the time. Americargo was more than 45 days late with its portion of the August premium. Although Star Diesel's portion of the premium was received prior to the expiration of the grace period, it was only a partial payment. There is no provision in the contract which says that the premium is considered paid when a partial premium is received. In fact, the termination language says that the contract "may be terminated at any time ... in the event that the Group does not make the premium payment within the grace period." Thus there is no evidence to support appellant's bad faith claim.
 
 Conclusion
 
 39
 Appellant has presented no evidence that there was more than one contract in existence so as to preclude Blue Cross from cancelling Star Diesel's coverage on the basis of Americargo's nonpayment of its portion of the group premium. Thus, Blue Cross rightfully terminated the contract in accordance with the terms outlined in the Americargo Group Contract effective August 1, 1989. Appellant's estoppel, waiver and bad faith claims are preempted by ERISA and there is no evidence in the record which supports any of those claims.
 
 
 40
 For these reasons, we AFFIRM.
 
 
 
 *
 Hon. John Feikens, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Kerr also owned one other company which was subsequently closed
 
 
 [2]
 See supra note 1
 
 
 [3]
 The group contract numbers are indicated on the cover of the Americargo Contract: JNG01, JNG02, and JNG03
 
 
 [4]
 Because Americargo was a Small National Account Product group ("SNAP"), it was extended a 45-day grace period
 
 
 [5]
 See supra note 4
 
 
 [6]
 Americargo remitted its payment on September 25, 1989, ten (10) days after the expiration of the grace period
 
 
 [7]
 Appellant's brief alleges the date was September 17; the reply brief alleges September 19. The 45-day grace period expired on September 15, 1989
 
 
 [8]
 As evidence of the existence of three separate contracts, appellant offered three copies of the same unsigned Americargo Group application form
 
 
 [9]
 The record does not reveal who suggested remitting separate payments or assigning separate group numbers to each of the Americargo locations. It may have been the suggestion of Americargo for its own internal recordkeeping purposes. If this was done at Americargo's suggestion, clearly this should not be interpreted as creating an ambiguity in the contract as written and negotiated by Blue Cross